IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA
PHILADELPHIA DIVISION

| | |
|---|---|
| ABIRA MEDICAL LABORATORIES, LLC d/b/a GENESIS DIAGNOSTICS | § § § § |
| vs. | § CIVIL ACTION NO. _____ § |
| TRANSPORTATION INSURANCE COMPANY, INC. | § § § |

## PLAINTIFF'S ORIGINAL COMPLAINT

AND NOW COMES, Abira Medical Laboratories, LLC d/b/a Genesis Diagnostics ("Genesis"), the Plaintiff herein, by and through its undersigned counsel, who files this Original Complaint suing Transportation Insurance Company, Inc. ("TIC"), the Defendant herein. In support thereof, the Plaintiff alleges as follows:

I.

INTRODUCTION

1. On May 21, 2018 Plaintiff Genesis renewed its "CNA Paramount" insurance policy issued and underwritten by the Defendant (Policy Number C 6049524348). That policy provided business loss and business income loss coverage to Genesis in the event of property loss and/or business interruption. On July 3, 2019 Defendant TIC was provided with notice of Genesis' claims under the policy regarding losses sustained as a result of actions taken against Plaintiff's property during the term of coverage running from August 1, 2018 through May 21, 2019.

2. In spite of being timely put-on notice of Plaintiff's claims, and further in spite of ample time to conduct its investigation, TIC failed to promptly investigate and pay claims due under the insurance policy. As a result of Defendant's breach of its duties of good faith and fair

dealing that were owed to its insured, Genesis was forced to bring this lawsuit against TIC for damages arising out of Defendant's breach of contract and/or insurance bad faith.

II.

JURISDICTION and VENUE

3. The Court has jurisdiction of this case under 28 U.S.C. §1332(a)(1). Additionally, the Court has supplemental jurisdiction over Plaintiff's state law claims by virtue of 28 U.S.C. §1367. This lawsuit was tolled for eight (8) months by written agreement of the parties.

4. Venue is proper herein pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the claims raised in this proceeding occurred in this district. Moreover, Plaintiff's principal place of business and its property are located in the Borough of Langhorne, Bucks County, Pennsylvania, which is situated within the boundaries of the United States District Court for the Eastern District of Pennsylvania.

III.

PARTIES

5. Plaintiff Genesis is a foreign limited liability company organized under the laws of the State of New Jersey, authorized to conduct business in the Commonwealth of Pennsylvania, with its principal place of business being located in Langhorne, Bucks County, Pennsylvania.

6. Defendant Transportation Insurance Company, Inc. is a property and casualty insurance underwriting company. Defendant TIC is a foreign company organized under the laws of the State of Delaware, and is authorized to conduct business in the Commonwealth of Pennsylvania. Defendant TIC may be served with process at its principal place of business located at 151 N. Franklin Street, Chicago, Illinois 60606.

IV.

FACTUAL BACKGROUND

7.      The Plaintiff is a national medical testing laboratory company based in Langhorne, Pennsylvania. It holds a Pennsylvania medical laboratory license, and it provides clinical laboratory, pharmacy, and addiction rehabilitation services to numerous medical service providers located throughout the country. It employs approximately 225 employees, including, but not necessarily limited to physicians, scientists, technicians, sales representatives, and administrative personnel. Those personnel provide clinical and toxicology laboratory testing for thousands of patients, commonly upon referral of a medical doctor or medical service provider.

8.      As part of its business model, the Plaintiff performs clinical laboratory, pharmacy, genetics, and addiction rehabilitation testing services at its facilities in Langhorne, Pennsylvania for numerous patients located throughout the United States (the "Laboratory Testing Services"). Those Laboratory Testing Services are normally billed either directly to the patient, or a patient's third-party insurer, or to Medicare/Medicaid.

9.      The hardware and software utilized by Plaintiff to service its Laboratory Testing Services are under Plaintiff's exclusive control, maintained in a secure computer room located on the premises of the Plaintiff's business in Langhorne, Pennsylvania. The records can only be accessed through the Plaintiff's proprietary software. The Plaintiff's computers serve as the central database for its business records, as well as the database for its clients' patient records.

10.     The electronic records maintained on the Plaintiff's servers include, but are not limited to patients' medical histories, doctor's notes and diagnoses, prescription-drug information, letters of medical necessity, and the Plaintiff's clinical-laboratory test results. They also include all billing information relative to each patients' files. The software utilized to service those records

are proprietary to the Plaintiff, and contain confidential trade information developed and utilized by the Plaintiff. All of those records are protected from disclosure via Title II of the Health Insurance Portability and Accountability Act of 1996 ("HIPPA"), which is codified at 42 U.S.C. § 300gg, 29 U.S.C § 1181 *et seq.*, and 42 USC 1320d *et seq*.

### A.     Genesis purchases software and hardware from Comtron, Inc. in 2015.

11.     Comtron, Inc. ("Comtron") was a Computer Integrated Systems Design company based in Great Neck, New York. It provided healthcare-technology such as web-based electronic medical records, medical billing, and laboratory information system software known as Medgen and Labgen LIS. Through its wholly-owned subsidiary, MFI, it also provided billing and collection services for companies such as Genesis.

12.     On July 7, 2015, Genesis purchased software, computer hardware, and medical-technology services from Comtron. That software, hardware, and services included the following:

(a)     The Labgen Laboratory Management System pain management software;

(b)     A Labgen server and hardware;

(c)     A Labgen Billing Module;

(d)     Labgen Laboratory Management System clinical module software;

(e)     A Labgen Microbiology Module; and

(f)     Installation and maintenance and support software.

13.     Under this "Labgen" agreement, Comtron represented that the Labgen LIS software would provide certain system features, including patient requisition entry, automated and manual result entry, statistic and analytic reports, reflexive test ordering, laboratory lists and daily/pending logs, drug reporting, and automated backups with no down time. In addition to serving as the central database for all of Genesis' records and its clients' electronic medical records ("EMR") –

including the clients' medical histories, doctor notes and diagnoses, prescription drug information, letters of medical necessity, and Genesis' clinical laboratory test results – the software purchased in 2015 was also represented by Comtron to be capable of monitoring and reporting on clients' medical insurance, billing, and claims processing information.

14. The hardware and software purchased by Genesis from Comtron served as the central database for Genesis' records, as well as the database for its client's patients' records. As noted above, the EMR included the patients' medical histories, doctor's notes and diagnoses, prescription-drug information, letters of medical necessity, and Genesis' clinical-laboratory test results. Those records, as well as the hardware used to store same, and the software used to access same, were permanently located in a secure computer room located on Genesis' property in Langhorne, Pennsylvania.

### B. Genesis encounters problems with Comtron's software.

15. During the first year of the Labgen Agreement, problems arose with the Billing Module component of the Labgen software. Genesis experienced numerous, consistent, and recurring issues with respect to the software's capability to interface with the other Labgen software. Genesis experienced slowness and crashing of the software, and was unable to access or create reports required to perform claims processing and billing for Genesis' laboratory services.

16. In the spring of 2016, in an effort to rectify problems with the Billing Module software, Comtron agreed to provide Genesis with its new, "next generation" technology known as Medgen (the "Medgen Software") in place of the Labgen Billing Module at no additional cost. To alleviate Genesis' concerns regarding the ability to transfer information pertaining to a client's EMR and insurance-related information, which would have required the manual input of hundreds of thousands of data points and hundreds of man-hours, Comtron represented that the information

previously input and contained in Labgen could be automatically transferred or "mapped" into the Medgen Software. Unfortunately, Genesis experienced continuing technical issues and problems with the Labgen and Medgen Software.

### C. 2018 Service Agreements between Genesis and Comtron.

17. In an effort to bypass some of the problems encountered by Genesis with the Labgen and Medgen software, on March 9, 2018, Genesis and Comtron entered into a Services Agreement (the "First Services Agreement"), whereby Comtron agreed to provide administrative and clinical functions for the documentation, management, and collection of revenues related to laboratory services performed for Genesis' clients. The First Services Agreement was amended by virtue of a Second Services Agreement entered into by Genesis and Comtron on March 23, 2018. Under those Service Agreements, Comtron agreed to provide claims processing and billing services for all of Genesis' patient accounts. Under Section 5(b) of the First Services Agreement, Comtron further agreed that "all business records and clients of [Genesis], whether managed by [Comtron] during the course of [Comtron's] engagement or otherwise acquired by [Genesis] are the sole property of [Genesis]."

18. The First Services Agreement provided that Comtron would perform claims processing on behalf of Genesis for all medical insurance claims beginning January 1, 2018 in regards to Laboratory Testing Services provided by Genesis to its clients and their patients, including, but not limited to claims submissions to third-party payors, follow up, resubmissions and appeals for those claims, as well as billing services for Genesis' clients to the extent those services were not covered by the clients' and/or their patients' insurance carrier. Given the number of patients who received Laboratory Testing Services provided by Genesis (those numbers were, at a minimum, in the hundreds of thousands), the value of the claims to be submitted by Comtron

on behalf of Genesis, to various third-party payors, Medicare, and/or Medicaid, were worth tens of millions of dollars during the period of time subject to this lawsuit.

  **D.**  **Comtron failed to submit Genesis' claims to third-party payors.**

19. In August of 2018, a series of business disputes arose between Genesis and Comtron. Those disputes included the following:

  (a) In August 2018 Comtron inexplicably began issuing invoices for software/hardware and services that were never agreed upon and were inconsistent with the parties' agreements. Comtron had represented that it would provide the Medgen software to Genesis at no additional charge, in an effort to mitigate the problems encountered by Genesis with respect to the Labgen software. Comtron threatened to deny Genesis access to the Labgen and Medgen Software if Genesis did not capitulate and pay the fees demanded in August, 2018.

  (b) Sometime thereafter, Genesis found out that Comtron had surreptitiously installed a "kill switch" within the source code of the Labgen/Medgen software it sold to Genesis. That kill switch could allow Comtron to send a message from a remote locale to Genesis' computers in Pennsylvania, and effectively shut down the software installed on that hardware, which in turn would effectively deny Genesis access to its records, the records of its clients, and the records of thousands of patients.

  (c) Faced with the possible theft and/or denial of access to thousands of account records, Genesis was forced to capitulate to Comtron's extortion, and pay over $150,000.00 in fees to Comtron.

  (d) In February of 2019, Comtron again issued invoices for charges never agreed to by Genesis, which were beyond the scope of the prior agreements. Comtron continued to issue illegal invoices and continued to threaten Genesis with a shutdown of its software, in a clear pattern of ongoing extortion. However, Genesis refused to capitulate to Comtron's continuing demands, and on February 11, 2019, due to Comtron's misrepresentations and non-performing Medgen Software, Genesis was forced to procure separate software at significant expense for the purpose of conducting the claims processing and billing services. In retaliation, Comtron immediately and illegally went beyond its prior threats and actually shut down Genesis' access to its records, including client EMR necessary for patient treatment and billing. In doing so, Comtron effectively took possession of Genesis' property from its locale in Langhorne, Pennsylvania, and damaged Plaintiff's servers.

  (e)  On February 22, 2019, Comtron's owner, Morris Lalehzar, made it plain that Comtron had activated the "kill switch" and denied Genesis access to its records in order to compel Genesis to pay the prior disputed invoices.

 20. As noted above, the computer servers and software which maintained Genesis' records were located on the premises of Genesis' property in Langhorne, Pennsylvania. Genesis had contracts with an independent contractor, Comtron, to maintain those servers, and the Data stored therein. Genesis further had contracts with that contractor, Comtron, who was responsible for providing billing services and the submittal of claims on Genesis' behalf to numerous third-party payors (i.e., insurance companies), Medicare, Medicaid, and direct pay clients/patients. Comtron failed to timely submit those claims.

 21. Genesis' dealings with Comtron did not include the secret incorporation of a "kill switch" in the software sold by Comtron to Genesis. When Comtron activated that device in February of 2019 from an off-premises locale, after a dispute arose between the parties, Comtron not only denied Genesis access to its records and damaged its computer servers, but Comtron also effectively stole property from Genesis, and held it hostage pending payment of fees.

 22. During the period of time wherein Comtron held Genesis' records in hostage, insurance claims arose which were not submitted by Comtron to various third-party payors. Those acts cost Genesis millions of dollars of business income lost during the period of time running from August 1, 2018 through May 21, 2019; a period of time covered by CNA's insurance policy.

 **E.** **Insurance Policy Number C 6049524348.**

 23. Defendant TIC issued a Business Loss insurance policy to Genesis on May 21, 2018. The term of the policy covered the period of time running from May 21, 2018 through May 21, 2019. Coverage provided under the policy included Business Property, Crime, and loss of

Business Income, with coverage limitations of two million ($2,000,000.00) for personal property, and seven million ($7,000,000.00) dollars for loss of business income.

24. The loss incurred by Genesis was discovered within the one (1) year period after expiration of the policy. Notice of that loss was timely provided by Genesis to the Defendant on July 3, 2019. The Defendant was requested by Genesis to provide coverage under policy number C 6049524348 regarding personal property and business income losses sustained as a result of actions taken by and/or omissions committed by Comtron during the period of time running from August 1, 2018 through May 21, 2019.

25. An initial telephone meeting between the Plaintiff and the Defendant's representatives was held on July 9, 2019. Subsequently, by email dated July 10, 2019, Genesis was provided with notice that a forensic investigator, Richard Gatz, Esq., was assigned to investigate Genesis' claim. Genesis was requested to provide Defendant's representatives with further information to assist its investigation. In a follow-up letter sent on August 23, 2019, Genesis was provided notice that another forensic consultant had been retained to assist Mr. Gatz with the Defendant's investigation. That expert forensic consultant was Mr. Matt Scott.

26. On October 3, 2019 Genesis sent its information and documentation to Defendant's representatives via email. Subsequently, a follow-up meeting was held on November 21, 2019 between Genesis' representatives and the Defendant's representatives. The meeting was held to facilitate a physical examination of Genesis' premises in Langhorne, Pennsylvania, along with its computer servers, by Defendant's experts, Messrs. Gatz and Scott. The meeting also facilitated Defendant's interviews of Genesis personnel in order to allow TIC "to gain a better understanding of the cause of loss and claimed damages." A follow up on-site examination of Plaintiff's computer servers was conducted by Mr. Scott on or about October of 2021.

27. About one month after the meeting of November 21, 2019, the Defendant sent a position statement to Genesis on December 20, 2019. In it the Defendant's representative noted that "there has been no direct physical loss or damage to property reported. The loss appears to be related to the inability to recover income for services provided but not invoiced, due to an information system failure." That incorrect finding was based upon an unreasonable investigation, which in turn led to the filing of the instant lawsuit.

V.

CAUSES OF ACTION

A. *Count 1 – Common law cause of action for bad faith and/or breach of contract*.

28. Plaintiff realleges and incorporates herein, as if fully set forth at length, each allegation set forth in paragraphs 1 through 27 above.

29. Where an insurer acts in bad faith, by unreasonably refusing to settle a claim, it breaches its contractual duty to act in good faith, and it further breaches its fiduciary duty to an insured such as Genesis. Under this common law bad faith action, an insured such as Genesis can recover traditional contract damages, including compensatory damages.

30. According to the Policy Declarations Section of "CNA Paramount" Insurance Policy Number C 6049524348 (the "Policy"), Genesis purchased Business Property coverage, Crime coverage, and Loss of Business Income coverage from the Defendant for the term of coverage running from May 21, 2018 through May 21, 2019. All payments due from Genesis were made; hence, coverage for loss of Business Property and lost Business Income during the term of the Policy was in full force and effect. This means a contract of insurance had arisen between Genesis and the Defendant.

31. Genesis caused notification of its loss under the Policy to be sent to the Defendant on July 3, 2019, which timely put the Defendant on notice of Genesis' claims for loss of Business Income and loss of Business Property under the terms of Insurance Policy Number C6049524348. This meant that the Defendant's duties of good faith and fair dealing under the insurance contract were timely invoked. The Defendant did not accept or issue a denial of coverage within 15 days of July 3, 2019.

32. A common law cause of action for bad faith may be shown through a defendant's failure to comply with the covenant of good faith and fair dealing in breaching duties imposed by a contract. For example, the Defendant's duty to conduct a reasonable investigation arose under the Policy. The standards for that duty may be found under 31 Pa. C.S. §146.6:

> Every insurer shall complete investigation of a claim within 30 days after notification of claim, unless the investigation cannot reasonably be complete within the time. If the investigation cannot be completed within 30 days, and every 45 days thereafter, the insurer shall provide the claimant with a reasonable written explanation for the delay and state when a decision on the claim may be expected.

31 Pa. C.S. §146.6.

33. Genesis' written claims were originally tendered to the Defendant's representatives on July 3, 2019. Defendant's representatives sent letters requesting additional data on July 12, 2019 and August 23, 2019. Genesis responded by producing the requested data on October 3, 2019. No further requests for information were submitted by the Defendant's representatives prior to TIC's denial of coverage over two (2) months later.

34. On November 21, 2019, a date which was 49 days after Genesis' production of data and information on October 3, 2019, a meeting was held on the premises of Genesis' business locale in order to give Defendant's forensic examiners an opportunity to inspect Genesis' computer servers and business property, as well as giving the Defendant a further opportunity to interrogate

Genesis' personnel. That was the end of the Defendant's investigation. Thereafter, on December 20, 2019 Defendant's representatives issued a position statement which effectively denied coverage.

35. The denial of coverage correspondence disseminated by the Defendant was sent outside the 45-day period that had been activated on October 3, 2019, and it failed to reflect the reasons for an ongoing investigation. That correspondence was also sent outside the 15-day deadline for acceptance or denial of Genesis' claims which had also been invoked back on October 3, 2019. These acts and/or omissions constitute violations of §146.6. They reflect an effort on TIC's part to stall Genesis' claims for benefits under the Policy. As such, they demonstrate the Defendant's breach of its duties under the Policy to conduct a reasonable investigation of Genesis' claims.

36. The Defendant not only failed to reasonably investigate Genesis' claims, but it also failed to pay a prompt, fair, and equitable settlement of Genesis' claims. The standards for those duties may be found under 31 Pa. C.S. §146.7. In that connection, §146.7 states in pertinent part as follows:

> §146.7. Standards for prompt, fair and equitable settlements applicable to insurers.
>
> (a) Acceptance or denial of a claim shall comply with the following:
>
> (1) Within 15 working days after receipt by the insurer of properly executed proofs of loss, the first-party claimant shall be advised of the acceptance or denial of the claim by the insurer. An insurer may not deny a claim on the grounds of a specific policy provision, condition or exclusion unless reference to the provision, condition or exclusion is included in the denial. The denial shall be given to the claimant in writing and the claim file of the insurer shall contain a copy of the denial.
>
> (c) The following provisions govern acceptance or denial of a claim where additional time is needed to make a determination:

> (1) If the insurer needs more time to determine whether a first-party claim should be accepted or denied, it shall so notify the first-party claimant within 15 working days after receipt of the proofs of loss giving the reasons more time is needed. If the investigation remains incomplete, the insurer shall, 30 days from the date of the initial notification and every 45 days thereafter, send to the claimant a letter setting forth the reasons additional time is needed for investigation and state when a decision on the claim may be expected.

31 Pa. C.S. §146.7(a)(1) and (c)(1).

37. Under §146.7(a)(1), the Defendant was required to issue an acceptance or denial of Genesis' claims within 15 days after proof of loss had been tendered on July 3, 2019. It failed to comply with that deadline. Instead, the Defendant's representatives sent letters requesting additional data on July 12, 2019 and August 23, 2019, respectively, thereby invoking the additional 45-day period found under §146.7(c)(1). Genesis responded by producing the requested data on October 3, 2019. At that point, the Defendant had to issue an acceptance or denial of Genesis' claims within 15 days (said deadline being October 18, 2019), or it had to request an additional 45-day extension. No further requests for information or an extension of time were submitted by TIC prior to the issuance of its position statement over two (2) months later, on December 20, 2019. Hence, the standards found under §146.7 were also violated by the Defendant.

38. Under Part II of the Policy (Policy Coverage Parts), First Party Glossary of Defined Terms, Business Income is defined as net income. It is an element of Business Property. Under the Coverage Part of the First Party Glossary of Defined Terms, coverage includes Business Property and Business Crime Coverage. Hence, under the Policy loss of business income is included with coverage for both Business Property, as well as Business Crime Coverage.

39. The Policy is clear that coverage for Business Property includes Genesis' business locale in Langhorne, Pennsylvania. The computer servers in question were all located in

Langhorne, Pennsylvania. The business income that was lost directly relates to the data held hostage from those servers, the damage caused to the servers by virtue of the activation of the "kill switch," as well as the claims which were not submitted by Comtron which relate to the patient and billing data maintained on Genesis' computer servers.

40. Under the Policy a Covered Peril is "a fortuitous cause or event, not otherwise excluded." The only exclusions stated in the Policy for a Covered Peril are events which took place prior to the policy period, and "damage from unknown causes or events". The claims raised by Genesis under the Policy are for losses incurred during the policy term. Hence, the first exclusion under Covered Peril does not apply. As for "unknown causes or events," that is inapplicable because Genesis' losses arose out of Comtron's failure to submit claims on behalf of Genesis to numerous third-party payors during the period of time wherein coverage was provided under the Policy (i.e., May 21, 2018 through May 21, 2019), as well as for losses associated with Comtron's illicit activation of the "kill switch." Those are known occurrences and/or omissions during the period of coverage. Hence, Genesis' claims under the Policy concern a covered peril to property located in Langhorne, Pennsylvania, which led to a loss of business income during the policy period. Under these circumstances, the Defendant had duties to properly investigate Genesis' claims, and to timely pay those claims which were covered under the Policy. The Defendant failed in those duties.

41. The Defendant not only failed to provide coverage, but it also has engaged in unfair claim settlement practices by, (a) failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim with respect to which the insurer's liability had become reasonably clear, and (b) refusing to pay a claim without conducting a reasonable investigation with respect to the claim.

42. The Defendant's "efforts" in this case do not constitute a proper investigation; rather, they reflect an improper denial of claims after engaging in a campaign to stall the insured. They also reflect an intentional decision on the part of TIC to wrongfully deny coverage, when Genesis' right to that coverage was no longer "fairly debatable". If the Defendant disagreed with the amount to be paid in business income losses, even after the review of documents conducted by its two (2) forensic experts, it could have requested an independent appraisal; but it failed to do so. TIC was apparently not interested in paying any money to Genesis under the policy. That constitutes bad faith under Pennsylvania common law.

43. In the case at chief, an insurance contract clearly existed, the Defendant breached its duties under that contract. As a result of those breaches, a direct action arose against the insurer in which Genesis (the insured) is entitled to recover damages under the Policy for lost business income, as well as for the value of damages to business property. It is readily apparent in this case that the Defendant's actions and/or omissions with respect to conducting a reasonable investigation, and/or failing to timely make payment to Genesis under the Policy were unreasonable or negligent. Accordingly, the Plaintiff sustained traditional contract damages herein, including compensatory damages, for which it hereby seeks recovery.

  **B. *Count 2 – Statutory cause of action for bad faith under 42 Pa. C.S. §8371.***

44. Plaintiff realleges and incorporates herein, as if fully set forth at length, each allegation set forth in paragraphs 1 through 43 above.

45. Insurers such as the Defendant act in bad faith under §8371 when they take any frivolous steps or make an unfounded refusal to pay proceeds of a policy. A statutory tort action for bad faith under §8371 entitles an insured such as Genesis to seek additional damages set out under the statute. Those damages include, (a) an award of interest on the amount of the claim from

the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%, (b) an award of punitive damages against the insurer, and (c) an assessment of court costs and attorney fees against the insurer.

46. As noted herein in paragraphs 28 through 43 above, the Defendant did not have a reasonable basis for denying benefits to Genesis under the Policy. Moreover, the Defendant knew of or recklessly disregarded the lack of a reasonable basis for denial of coverage under the Policy.

47. During the period of time wherein Comtron held Genesis' records in hostage as a result of the activation of the "kill switch," insurance claims arose regarding Laboratory Testing Services performed by Genesis, which were not submitted by Comtron to various third-party payors during the term of the subject period covered by the Policy. Those acts and/or omissions cost Genesis millions of dollars in lost business income during the period of time running from August 1, 2018 through May 21, 2019, a period of time clearly covered under the Policy. There are no exclusions found under the Policy which allow the Defendant to deny coverage for Genesis' claims.

48. Under the Policy, the Defendant could have sought an independent appraisal regarding the value of Genesis' claims of lost business income, but it failed to invoke that appraisal. Instead, the Defendant denied coverage for no other apparent reason other than a specious request for information, in spite of being provided with documentation and voluminous records, as well as access to Genesis' computers and other business property via several on-site inspections. The Defendant was clearly engaged in a delay and a stalling campaign to keep from having to pay the Policy limits on Genesis' claims. That is not a reasonable basis for denial of Genesis' claims under the Policy, and the Defendant knew of or recklessly disregarded the lack of a reasonable basis for denial of coverage under the Policy.

49. As a result of the improper investigation, the Defendant wrongfully and in bad faith denied coverage, and breached the insurance policy purchased by Genesis for the protection of its business. As such, Genesis sustained statutory damages herein under §8371, including an award of interest equal to the prime rate plus 3%, an award of punitive damages, and an assessment of court costs and attorney fees against the insurer, all of which Genesis seeks recovery for herein.

VI.

DAMAGES and ATTORNEY'S FEES

50. Genesis seeks seek all damages as allowed by law, in excess of the minimum jurisdictional limits of the Court. Genesis submits the value of its claims exceeds $75,000.00.

51. The acts and/or omissions of the Defendant were performed intentionally, knowingly, maliciously, and/or in utter and reckless disregard of the rights of Genesis. Accordingly, Genesis requests punitive damages for all causes of action for which exemplary damages are available pursuant to Pennsylvania law.

52. To the extent allowed by either statute, contract, common law, or equity, Genesis hereby requests its reasonable and necessary attorney's fees incurred by the Plaintiff in this case.

VII.

PRE- and POST-JUDGMENT INTEREST, as well as
COSTS OF COURT and OUT-OF-POCKET EXPENSES

53. Genesis pleads for pre- and post-judgment interest at the maximum rate(s) allowed by law. Genesis also pleads for all costs of court and out-of-pocket expenses incurred herein.

VIII.

JURY DEMAND

54. In furtherance of Fed. R. Civ. P. 38 and/or 231 Pa. Code §1007.1, Genesis hereby demands a trial by jury on all issues of fact raised herein.

WHEREFORE, PREMISES CONSIDERED, Plaintiff Abira Medical Laboratories, LLC d/b/a Genesis Diagnostics prays for judgment against Defendant Transportation Insurance Company, Inc., awarding Genesis the following:

A. all actual, compensatory, special, incidental, statutory, and/or punitive damages in an amount to be determined by the trier of fact;

B. attorney's fees, costs of court, and out-of-pocket expenses;

C. pre- and post-judgment interest at the highest rate(s) allowed by law; and

D. all other and such further relief, either at law or in equity, as may be deemed appropriate by the Court.

Respectfully submitted this 31st day of March, 2022.

                LAW OFFICE OF DAVID W. GHISALBERT

By:   / S /   D.W. Ghisalbert
     David W. Ghisalbert
     Pa. ID No. 328556
     5907 Bonita Creek
     Missouri City, Texas 77459
     (713) 808-9697 [telephone]
     (713) 893-6942 [facsimile]
     dghisalbert@dwglawoffice.com [email]

COUNSEL FOR PLAINTIFF,
ABIRA MEDICAL LABORATORIES, LLC
D/B/A GENESIS DIAGNOSTICS

CO-COUNSEL:

Joseph B. Fiorenzo, Esq.
*Pro Hac Vice to be Applied For*
SILLS CUMMIS & GROSS, P.C.
One Riverfront Plaza
Newark, New Jersey 07102
(973) 643-7000 [telephone]
(973) 643-6500 [fax]
jfiorenzo@sillscummis.com [email]